EDWARD ARTHUR, Appellant, v. J. W. CRAFT, Appellee.

ASSAULT AND BATTERY: Self-Defense—Evidence. Evidence
1  held to afford no basis whatever for instructions relative to
self-defense.

ASSAULT AND BATTERY: Unjustifiable Assault. No issue but
2  the one pertaining to measure of damages should be submitted
on a record which reveals an unjustifiable assault.

*Appeal from Black Hawk District Court.*—H. B. BOIES,
Judge.

NOVEMBER 18, 1919.

ACTION for damages for assault and battery. There
was a verdict and judgment for the defendant. Plaintiff
appeals.—*Reversed.*

*Mears & Lovejoy,* for appellant.

*Paulson & Wood* and *W. M. Blough,* for appellee.

EVANS, J.—The plaintiff unsuccessfully moved for a
new trial, on the ground that the verdict was against the
evidence and contrary to the law. This is the broad ground
of his contention on this appeal. It appears

1. ASSAULT AND
BATTERY:
self-defense:
evidence.

from plaintiff's testimony that he was un-
lawfully assaulted and severely beaten by
the defendant, while driving with a horse
and buggy along the highway. He was hailed by the de-
fendant, with the remark that he wanted to speak to him.
The defendant came to the buggy in which the plaintiff was
riding, and immediately made the assault. The only dif-
ference of version in the testimony of the respective parties
at this point is that the defendant testified that the plain-
tiff stopped in the road, and told him he wanted to speak to
him. The following excerpts from the testimony of the de-
fendant on the trial afford a sufficient indication of his ver-
sion of what transpired.

On direct examination, the defendant testified:

"Mr. Arthur wanted to know why it was that I didn't
let our fence deal go through. That was a law suit we had
over a fence, and I had asked a continuance of the case, and
I said: 'Mr. Arthur, I will tell you why. One of my best
witnesses is in Missouri.' And I says, 'You have been tam-
pering with my other witnesses, and I didn't want to go

ahead unless I knew more about where I was at.'. He said there was nothing to it; that he hadn't said anything to my witnesses. I says, 'You have, and I can prove it, if you just wait a few minutes, by the lady in the house.' 'Well,' he says, 'they are nothing but a lot of dirty whores, the whole bunch of them.' Just that way. I says, 'Who do you mean?' He says, 'You are no better than the rest of them.' I had a jacket on, and I was warm, and I just slipped my jacket off, and I says, 'You can't call me that,' and started at him, and he just started and hit his horse with the lines, and I grabbed the lines of his horse. The horse then had got in the driveway against the gate. The gate was open the other way,—a sliding gate,—part of it in the road, and part was on the farm; and his horse, in the mix-up, had got against the gate, and I had hold of the line, and I took him a couple right on the nose, just as quick as I could. He commenced to holler and strike and slap his horse. The horse got up into the gate, because he had hit it, and it jumped. I was then standing pretty near in front of him, kind of up at the horse's head. I grabbed the line as he hit the horse. Mr. Arthur slid out of the buggy and start- ed for me, and me grabbing the line, he got fixed between the buggy box and the wheel, and couldn't get at me. I had hold of the line, and I was coming, and he sat there, with his left hand striking at me, and he had hold of the other line with his right hand, and he struck at me with this hand, and I hit him a couple or three times, and he hol- lered 'Enough,' and I let him go."

On cross-examination, he testified:

"He didn't turn in towards the gate. He just drove up there and stopped, with his horse headed up against the gate that was open; but he didn't turn his horse's head towards the gate. In the mix-up, the horse run up against the gate, as far as it could get. When the gate was open, it was part of it in the highway. When Arthur came up

there, his horse did not turn in towards the opening of the gate. He came to a stop out in the highway. He did not turn into the driveway, as he came up there. He drove up beside the gate. The horse came to a stop before I went out there. I hadn't seen him before. He said he wanted to talk to me. He didn't seem to be mad or anything. When I got the door or rope adjusted so I could do so, I went toward Mr. Arthur, who was seated in his buggy. He wanted to know why I asked a continuance of that case, and that was the second lawsuit he had had. We were on speaking terms at that time, so as to say 'Good morning.' There had been times when he wouldn't look up, for the past two or three years. I spoke to him about the absence of some witness, and he proceeded to call them names. I told him one particular witness was absent, and that he had tampered with a couple of others. This conversation probably took us two or three minutes. I asked him who he meant by those names, and he says, 'You are no better than the rest of them.' I says, 'You can't call me that,' and I started to pull off my jacket. Just as I started to pull off my jacket, he hit his horse, and tried to run over me. He shot right up into the gateway, and tried to run over me. He shot right up into the gateway towards the gate, but he couldn't get into the gate. on account of the gate being open ahead of his horse. Q. But he hadn't turned back into the highway to get away from you? A. Yes, he had. He backed up a little bit. Q. You made for him, and he whipped up the horse, did he? A. No; for when I started to take off my jacket, he hit his horse with the lines, and she jumped. She commenced to jump around, and I grabbed the lines. I did not get up to the buggy at all, nor put my foot on the step. I dealt the blows, standing on the ground. I think I hit him twice on the nose, and don't know whether I hit him anywhere else or not. I might have struck him a third time, and I might have hit him in the jaw. He was

striking at me with his left hand, and the horse was jumping around; and that is all there was. I couldn't tell you whether I hit him more than that. I was holding the lines with my left hand and striking him with my right. He had the lines in his right. I had grabbed the lines as he whipped up the horse. He hit the horse and the horse started to jump, and I was right in front of it. I grabbed the lines. He got away from me because I let him go. He says, 'For God's sake, quit.' He was not there more than from three to five minutes. He said, 'For God's sake, quit.' I says, 'Take back what you called me,' and he says, 'Yes, I will.' I says, 'Take it back,' and he did; and I let loose of the lines, and so he went. Raised right back in his buggy, with his face towards me. I hit him on the nose the first two times, and I might have hit him a third time, and might have hit him in the eye. I wouldn't say. After he started away, he called me those names I spoke of, and then I jumped into my buggy and took after him, and chased him about three fourths of a mile."

Immediately after the event thus described by the defendant, he appeared before the mayor of La Porte City, as an informer against himself, and asked leave to pay a fine. This privilege was denied him. Later, he was arrested, upon information of plaintiff, charged with assault and battery. Upon the day set for trial, he pleaded guilty. His defense in the present action is that he acted only in lawful self-defense against an assault upon him by the plaintiff. In order to find a verdict for him under the instructions of the court, the jury must have found that the defendant was lawfully defending himself. There is nothing in the record from which such fact could be found, and the jury must have acted from impulse or passion. The injuries suffered by the plaintiff were substantial. He was a man 55 years of age, whereas the defendant was a man of 42. The plaintiff was partially blind, having lost the sight of his

right eye.   The defendant directed his blows quite accurate-
ly to the plaintiff's left eye, and seriously injured it.   The
campaign of self-defense conducted by the defendant was
not so resplendent with heroic acts as might have justified
the jury in losing sight of the legal merits of the case.   The
last three fourths of a mile of this campaign was mistaken
by witnesses, at a distance, for a horse race, which was
apparently won by a length by the plaintiff's horse.   The
defeat suffered by the defendant in this race may have had
its humiliation, but it is not evidence of self-defense.

We think plaintiff's motion for a new trial should have
been sustained, on the ground that the verdict was contrary
to the evidence and contrary to the instructions of the
court.   We may note further that the in-
**2. ASSAULT AND BATTERY: unjustifiable assault.**   structions of the court were quite evenly
balanced on the question of which party was
the aggressor.   Instruction No. 6 said:

"If you find from the evidence and under these instruc-
tions that the plaintiff was the aggressor, and had commit-
ted an assault or assault and battery upon the defendant,"
etc.

A like hypothesis was laid down in Instruction No. 4.
There was no occasion for this hypothesis.   Upon the evi-
dence of the defendant himself, he was the aggressor, and
did assault and beat the plaintiff without legal excuse.   The
court should have so instructed the jury, and should have
submitted the case to the jury on the measure of damages
only.   For the reasons indicated, the judgment below must
be reversed, and a new trial ordered.—*Reversed.*

' LADD, C. J., PRESTON and SALINGER, JJ., concur.